Filed 10/2/25  P. v. Shanley CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>SEAN MICHAEL SHANLEY,<br><br>    Defendant and Appellant. | D082989<br><br><br><br>(Super. Ct. No. FSB20003774) |

APPEAL from a judgment of the Superior Court of San Bernardino County, Mary E. Fuller, Judge.  Affirmed.

Jill M. Klein, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Kristen Ramirez, Deputy Attorneys General, for Plaintiff and Respondent.

## I.  INTRODUCTION

A jury found defendant Sean Michael Shanley guilty of first degree murder (Pen. Code, § 187, subd. (a)) with a lying-in-wait special circumstance

(*id.*, § 190.2, subd. (a)(15)) and a firearm enhancement (*id.*, § 12022.53, subd. (d)), and guilty of recklessly evading a peace officer (Veh. Code, § 2800.2). The trial court found defendant had a prior serious or violent felony conviction and sentenced him to life without the possibility of parole plus 25 years on the murder charge, and a consecutive 16-month term on the evasion charge.

Defendant raises several issues on appeal. First, he contends the trial court erred by overruling his objection under Code of Civil Procedure section 231.7[1] to the prosecutor's use of peremptory challenges against three prospective jurors whom the defense perceived to be Hispanic.[2] On the limited jury selection record before us, we find no error. As to two of the challenged prospective jurors, we conclude defendant failed to develop an adequate record as to their race or perceived race. As to the remaining prospective juror, our de novo review leads us to conclude there is no substantial likelihood that an objectively reasonable person would view race as a factor in the prosecutor's use of the peremptory challenge. (§ 231.7, subd. (d)(1).)

Second, defendant maintains the trial court erred by failing to instruct the jury about excusable homicide as it relates to his claim that he accidentally shot the victim. Based on the jury's express findings that defendant intentionally discharged a firearm and intended to kill the victim, we conclude the claimed instructional error was harmless.

---

[1] Further undesignated statutory references are to the Code of Civil Procedure.

[2] The parties use the term Hispanic throughout their briefs. To remain consistent, we also use that term.

Third, defendant asserts there was no evidentiary foundation for a hypothetical question the prosecutor asked an expert witness about the circumstances surrounding defendant's claim that he accidentally fired the murder weapon. Based on our review of the record, we conclude it was within the trial court's discretion to allow the question and answer.

Finally, defendant argues the prosecutor committed error during closing argument by undermining the presumption of innocence, shifting the burden of proof to the defense, and commenting on defendant's failure to call a logical witness whom the prosecutor knew was unavailable. We conclude that by failing to object and request an admonition as to each of these grounds, defendant failed to preserve this challenge for appeal. We further conclude defendant's alternative claim of ineffective assistance of counsel lacks merit.

Accordingly, we affirm the judgment.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background

At about 10:30 p.m. on May 4, 2020, Isaac Flores was shot in the back of his head while sitting in the driver's seat of his fiancée's BMW. Defendant was in the rear passenger seat of that car. The prosecution's theory was that defendant intentionally shot Flores after learning Flores was a "snitch." The defense initially suggested someone else shot Flores, but defendant ultimately testified he shot Flores accidentally.

### 1.  Prosecution Evidence

Around noon on May 4, 2020, Flores borrowed his fiancée's BMW, telling her he was going to run errands. Instead, Flores picked up a friend — Angelica D., who went by the moniker "Sky" — and they drove around while

3

ingesting drugs together, as they often did. Sometime that afternoon they ended up at their friend Rob G.'s duplex on Avenue E in Yucaipa.

At Rob's duplex, Flores and Sky socialized and consumed more drugs with a group that included: defendant; defendant's then-girlfriend, Samantha F.; Gilbert P., who went by the moniker "Dude"; Rochelle, who went by the moniker "Green Eyes"; and Rob. Flores was friends with Dude but had never met defendant.

Later that afternoon, Flores drove most of the group (including defendant) to a U-Haul facility in Redlands for unspecified reasons. After hanging out in the parking lot area for a while, the group returned to Rob's duplex where they resumed using drugs.

At some point, Flores and defendant discussed the possibility of Flores selling his gun to defendant, but they could not agree on a price. Despite the failed transaction, Flores and defendant seemed to be "getting along just fine."

Around 9:00 p.m., Flores and Sky left Rob's duplex to drop off Dude at a fast-food restaurant. Flores and Sky returned to the duplex to drop off some sodas, then left again around 9:30 p.m. so Flores could drive Sky home.

According to Samantha — who testified under a grant of use immunity — sometime after Flores and Sky left the duplex, Green Eyes received a phone call and then said something to defendant. Defendant then called Sky and "said he needed a ride, and he wanted [Flores] to take him." After the call, defendant grabbed his gun, tucked it into his waistband, and said Flores " 'is no good' " and that he (defendant) is " 'going to get this fool.' " Defendant also mentioned that Flores had a gun.

4

Meanwhile, Dude stole a silver Honda CRV and picked up his friend Kyla M.[3] Kyla was close friends with defendant, who looked out for her. Kyla testified that someone called Dude and told him to go to Rob's duplex because there was a problem. Dude then drove "like a f--king psycho" to Rob's duplex.

As defendant requested, Flores and Sky returned to the duplex and defendant got in the rear passenger-side seat of Flores's car. Sky testified that as they drove away, a large, dark SUV drove past them going the opposite direction on Avenue E. Defendant said something about his "'enemies'" being in that vehicle and for Flores to follow the SUV and get his gun ready. Flores turned the BMW around and followed the SUV.

As they approached Rob's duplex, Sky saw Dude standing in the middle of the road and a Honda CRV parked up ahead with a woman inside. Flores stopped his car in the middle of the road and reached under his seat, presumably to grab his gun. Sky called to Dude through the open front passenger window and talked with him while she prepared a methamphetamine pipe. As Sky was preparing the pipe, she heard a loud gunshot. She did not see Dude, Flores, or anyone else holding a gun. From the CRV, Kyla also heard what sounded like a car backfiring or possibly a gunshot.

After the loud sound, defendant and Dude immediately ran to the CRV and got inside. Sky gathered her belongings and followed suit. Before she

---

[3] Kyla testified at trial under a grant of use immunity. She repeatedly stated that she did not recall many of the details she gave to detectives during an interview regarding this case and maintained that reviewing the interview would not refresh her recollection. The trial court admitted the bulk of the interview into evidence and allowed the jury to consider it for its truth.

got out of Flores's car, Sky saw that he was motionless in the front seat with his head back and his eyes and mouth open.

In the CRV, defendant said, " 'Go, go, go,' " and repeatedly exclaimed, " 'What the f--k?' "  The CRV made a U-turn and sped off.  Kyla heard Sky tell someone over the phone that " 'Demon's a rata,' " meaning a rat or a snitch, and mentioning Flores's name.  The CRV later broke down and the group eventually parted ways.  Samantha testified that defendant later sold his gun to the wife of a close friend.

A neighbor who heard the shooting called 911 and sheriff's deputies responded around 10:43 p.m.  Deputies found Flores's car idling in the middle of the street, with the car in drive and Flores's foot on the brake pedal. Flores was unresponsive in the driver's seat, with a gunshot wound to his head.  An ambulance responded and medical personnel pronounced Flores dead at the scene.  Investigators found a spent 9-millimeter shell casing on the front passenger seat of Flores's car.  Investigators also found defendant's fingerprints on the exterior of the rear passenger side of the car.

A forensic pathologist performed an autopsy on Flores and determined the cause of death was a gunshot wound to the head and the manner of death was homicide.  The pathologist testified the bullet entered the back right side of Flores's head and exited the left cheek area.  Based on "stippling" and soot around the entry wound,[4] the pathologist estimated the gun that fired the fatal shot was fired "anywhere from near contact up to 24 to 30 inches away."

As noted (see fn. 3, *ante*.), detectives interviewed Kyla.  She initially denied defendant's involvement in the murder, claiming she saw only Sky

---

[4]     The forensic pathologist defined "stippling" as "the unburnt and burned gun powder residue that leaves the end of the weapon, actually strikes the skin, [and] leaves little red punctate marks on it."

6

and an unknown "Paisa"[5] exit Flores's car after the shooting. She eventually identified defendant as the "Paisa" by writing "Casper" (defendant's moniker), "NSF" (the Northside Fontana gang with which defendant was once affiliated), and "Sean S." (defendant's first name and last initial) on a tissue box. Kyla denied believing defendant killed Flores, but when asked why defendant would have killed him, she responded, "Like I said, the words I heard were 'rata.'" Kyla told the detectives, "I was never here," explaining at trial that she did not want to be labeled "a snitch" because "bad things" — including being killed — "happen that way."

Regarding the prosecution's theory that defendant killed Flores because defendant thought he was a snitch, Sky testified about an incident that occurred just over a week before the murder. On April 25, 2020, Beverly Hills police arrested Flores, Sky, and Dude after a search of the BMW they were traveling in yielded a shotgun, ammunition, methamphetamine, and drug paraphernalia. A few days later, Sky and Dude discussed whether Flores might be a snitch because he was released from custody so quickly. Sky also testified that Dude told her "a couple of days to a week" after the murder that defendant "talk[ed] about [Flores] being a snitch or a rat."

About six months after Flores's murder, on November 5, 2020, a Fontana Police corporal initiated a traffic stop on defendant's vehicle for a routine Vehicle Code violation. Samantha (defendant's then-girlfriend) and Dominic T. were in the car smoking fentanyl. Defendant initially slowed for the traffic stop but then accelerated, leading police on an 82-mile high-speed

---

5    Kyla explained at trial that "Paisa" means "certain . . . Hispanic" people.

chase. According to Dominic, defendant said during the pursuit, " 'Oh f--k, I am going to go to jail forever.' " Police eventually apprehended defendant.

After his arrest and while in custody awaiting trial, defendant spoke by phone to Samantha several times. Samantha testified at trial about several of those calls. In one of them, defendant and Samantha discussed retrieving and disposing of the murder weapon. In another call, defendant suggested that Samantha should implicate Rob in Flores's murder. Samantha explained at trial that Rob died shortly after the murder so "nothing would happen because Rob is dead." In other calls, defendant appeared to attempt to influence Samantha's anticipated trial testimony. They also used coded language — the "sky being cloudy" — to discuss Sky's apparent cooperation with law enforcement. Samantha testified that at some point defendant commented "that he had enough bodies on his hands."

### 2. Defense Evidence

Defendant testified in his own defense. He was 49 years old at the time of trial. Defendant grew up in Fontana and was associated with Northside Fontana, a gang he claimed no longer existed. Defendant acknowledged serving 16 years in prison for attempted murder with a firearm. Defendant used drugs and lived on the streets. Rob was a good friend who gave him a place to stay.

Defendant hung out at Rob's duplex on the day of the murder and smoked methamphetamine at one point. Defendant testified he first met Flores that day and that they got along well. Sometime on May 4, Flores drove defendant, Sky, and Green Eyes to a U-Haul facility in Redlands, but it was closed when they arrived. Defendant had a gun with him but left it on the bed at Rob's duplex during the U-Haul errand. When defendant left it,

8

the gun was loaded but was not "racked" (that is, there was no round in the chamber ready to fire).

After returning from the U-Haul errand, Flores and Sky left Rob's duplex. Defendant acknowledged that after Flores left, Green Eyes received a call and mentioned that Flores was "no good." Defendant testified he did not know whether Flores was actually "no good" and claimed "it didn't matter . . . if he was or not." Defendant denied ever saying he was "going to go get that fool."[6]

Defendant testified he called Sky to ask if she and Flores could return to give defendant a ride to his sister's house. Before leaving, defendant grabbed his gun from the bed where he had left it and tucked it into his waistband. When Flores and Sky returned, defendant got in the rear passenger seat behind Sky.

As they drove down Avenue E, defendant saw a large SUV heading toward Rob's duplex. Defendant believed the SUV belonged to someone who had previously caused trouble at Rob's duplex by showing up with a gun. Defendant "panicked a little bit" and asked Flores to turn the car around and for Flores to get his gun ready in case there was trouble.

Flores turned the car around to follow the SUV. After doing so, Flores stopped in the middle of the road because Dude had walked out into the street there. As Dude stood outside the front passenger window of Flores's car, defendant kept his attention on the large SUV, which was parked in Rob's driveway. The SUV then started heading toward Flores's car.

---

[6]    Specifically, defendant was asked at trial, "Did you ever state at all on May 4th that you are going to go get that fool, meaning referring to Isaac Flores?" Defendant responded, "No, not in, no." The prosecutor argued in closing that defendant "hesitated in his testimony" when giving this answer.

As the SUV approached, defendant pulled his gun from his waistband. As defendant raised the gun, it accidentally discharged, striking and killing Flores. Defendant insisted that he did not intend to shoot Flores and that he never chambered a round in the gun or otherwise readied it to fire. Defendant speculated that Rob must have readied the gun while defendant was on his U-Haul errand. Defendant therefore partially blamed Rob for Flores's death but denied ever telling Samantha to blame Rob.

When the gun went off, defendant freaked out and fled with Dude and Sky in the stolen CRV. Defendant admitted he never called 911 to summon help for Flores. Defendant claimed he threw away the murder weapon and denied giving it to a friend.

Defendant conceded he shot Flores but maintained it was an accident caused by his fear and paranoia. Defendant admitted that up until his trial testimony, he had never told anyone the shooting was accidental — he claimed he "was in denial with it."

Regarding the reckless evasion charge, defendant acknowledged he knowingly led police on a high-speed chase, weaving in and out of traffic. Defendant claimed he did not recall what was said in the car during the chase, but if he said (as Dominic testified) that he was going to spend the rest of his life in jail, it was because he "was out on bail for a gun" charge at the time.

Defendant conceded on cross-examination that he "agree[d] with pretty much everything every witness said in this case . . . about what happened on" the day of the murder.

## B. Procedural Background

The operative amended information charged defendant with one count of murder (Pen. Code, § 187, subd. (a)) with a lying-in-wait special

circumstance (*id.*, § 190.2, subd. (a)(15)) and firearm enhancement allegations (*id.*, § 12022.53, subds. (b)–(d)), and one count of recklessly evading a peace officer (Veh. Code, § 2800.2, subd. (a)). The information also alleged defendant suffered a prior conviction for a serious or violent felony. (Pen. Code, §§ 1170.12, subds. (a)–(d), 667, subds. (b)–(i)).

Trial began on September 14, 2022. On October 20, 2022, the jury found defendant guilty of first degree murder and reckless evasion. The jury also found true the lying-in-wait special circumstance and the Penal Code section 12022.53, subdivision (d) firearm enhancement allegations. In a bifurcated proceeding, the trial court found the prior serious or violent felony allegation to be true.

On May 30, 2023, the trial court sentenced defendant on the murder conviction to life without the possibility of parole plus 25 years, and on the reckless evasion conviction to a consecutive 16-month term.

## III. DISCUSSION

### A. The Trial Court Did Not Err by Overruling Defendant's Objection to the Prosecutor's Peremptory Challenges

Defendant contends the trial court violated his statutory and constitutional rights by overruling his objection to the prosecutor's use of peremptory challenges to excuse three prospective jurors whom the defense perceived as Hispanic. After defendant made his objection, the prosecutor explained at a sidebar conference that he excused one of the prospective jurors (Prospective Juror No. 79) because she had twice been the victim of a crime that an important prosecution witness had been convicted of committing (identity theft), and that he excused the other two prospective jurors (Prospective Juror Nos. 61 and 74) because they voiced concern over

11

the "single-witness rule" embodied in CALCRIM No. 301.[7]  The trial court found it "highly probable" that the prosecutor's stated reasons were valid and "unrelated to conscious or unconscious bias."  Accordingly, the court overruled defendant's objection.  Defendant maintains the court erred in doing so because the record shows there was a substantial likelihood that the prosecutor's stated reasons were unjustified, and because the trial court applied the wrong legal standard.  On the record before us, we find no error.  First, we conclude defendant failed to develop an adequate record as to the race or perceived race of Prospective Juror Nos. 61 and 74.  Second, based on our de novo review of the record, we conclude there is no substantial likelihood that an objectively reasonable person would view race as a factor in the prosecutor's use of a peremptory challenge as to Prospective Juror No. 79. (§ 231.7, subd. (d)(1).)

### 1.  The Section 231.7 Framework

We begin by describing the framework governing peremptory challenge objections under section 231.7.  We later describe how that process unfolded in the trial court.

" ' "Both the federal and state Constitutions prohibit any advocate's use of peremptory challenges to exclude prospective jurors based on race." ' [Citation.]  ' "Doing so violates both the equal protection clause of the United States Constitution and the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution." ' " (*People v. Holmes, McClain and Newborn*

---

7       CALCRIM No. 301 states:  "[Unless I instruct you otherwise], (The/the) testimony of only one witness can prove any fact.  Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence."

(2022) 12 Cal.5th 719, 759–760.) "Excluding by peremptory challenge even 'a single juror on the basis of race or ethnicity is an error of constitutional magnitude.' " (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1172 (*Gutierrez*).)

" 'Before January 1, 2022, trial courts examined peremptory challenges under the three-step inquiry established by *Batson v. Kentucky* (1986) 476 U.S. 79 . . . and *People v. Wheeler* (1978) 22 Cal.3d 258 . . . .' " (*People v. Ortiz* (2023) 96 Cal.App.5th 768, 791 (*Ortiz*).) Under that three-step inquiry, "the party objecting to a peremptory challenge had to first demonstrate a prima facie case of discriminatory purpose. [Citation.] The burden then shifted to the party exercising the peremptory challenge to provide a permissible, nondiscriminatory explanation. [Citation.] The third step required the trial court to decide if 'purposeful' discrimination motivated the peremptory challenge." (*People v. Uriostegui* (2024) 101 Cal.App.5th 271, 277–278.)

But after "studies showed that the existing *Batson/Wheeler* analysis . . . was inadequate to prevent racial discrimination," the "Legislature enacted section 231.7, effective in criminal trials beginning January 1, 2022, to establish 'a new process for identifying unlawful bias in the use of peremptory challenges during jury selection.' "[8] (*People v. Jimenez* (2024) 99 Cal.App.5th 534, 539–540 (*Jimenez*).)

Section 231.7, subdivisions (a) through (d), describe the procedure for objecting to a peremptory challenge of a prospective juror. These subdivisions specify when to make the peremptory challenge, and the standard by which a trial court must evaluate the reasons given to remove

---

[8] Section 231.7 will apply to civil trials starting January 1, 2026. (See Assem. Bill No. 3070 (Reg. Sess. 2019–2020); Stats. 2020, ch. 318, §§ 2, 3.)

13

the juror, including a nonexhaustive list of factors for the trial court to consider in arriving at its decision.

"Section 231.7, subdivision (a) prohibits the 'use [of] a peremptory challenge to remove a prospective juror on the basis of the prospective juror's race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or the perceived membership of the prospective juror in any of those groups' ('cognizable groups').  (*Id*., subds. (a), (i); see *id*. subd. (k).)  Discrimination in violation of this section need not be purposeful, but may involve 'unconscious bias,' which 'includes implicit and institutional biases.'  (*Id*., subds. (d)(1) & (d)(2)(C).)"  (*Jimenez, supra*, 99 Cal.App.5th at p. 540.)

"Once the opposing party [or the trial court] timely objects to the peremptory challenge, the party seeking to exercise the peremptory challenge must state the reasons justifying the challenge.  (§ 231.7, subd. (c).)  The trial court then evaluates only the given reasons, without speculating on or assuming possible justification, 'in light of the totality of the circumstances' and must sustain the objection if 'there is a substantial likelihood that an objectively reasonable person would view [actual or perceived membership in a cognizable group] as a factor in the use of the peremptory challenge.'  (*Id*., subd. (d)(1).)  The statute defines 'substantial likelihood' as 'more than a mere possibility but less than a standard of more likely than not.'  (*Id*., subd. (d)(2)(B).)"  (*Jimenez, supra*, 99 Cal.App.5th at p. 540.)

"Section 231.7, subdivision (d)(3) provides a nonexhaustive list of circumstances the court may consider in the analysis."  (*Jimenez, supra*, 99 Cal.App.5th at p. 540.)  This provision states:

> In making its determination, the circumstances the court may consider include, but are not limited to, any of the following:

14

(A) Whether any of the following circumstances exist:

(i) The objecting party is a member of the same perceived cognizable group as the challenged juror.

(ii) The alleged victim is not a member of that perceived cognizable group.

(iii) Witnesses or the parties are not members of that perceived cognizable group.

(B) Whether race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or perceived membership in any of those groups, bear on the facts of the case to be tried.

(C) The number and types of questions posed to the prospective juror, including, but not limited to, any the following:

(i) Consideration of whether the party exercising the peremptory challenge failed to question the prospective juror about the concerns later stated by the party as the reason for the peremptory challenge pursuant to subdivision (c).

(ii) Whether the party exercising the peremptory challenge engaged in cursory questioning of the challenged potential juror.

(iii) Whether the party exercising the peremptory challenge asked different questions of the potential juror against whom the peremptory challenge was used in contrast to questions asked of other jurors from different perceived cognizable groups about the same topic or whether the party phrased those questions differently.

(D) Whether other prospective jurors, who are not members of the same cognizable group as the challenged prospective juror, provided similar, but

not necessarily identical, answers but were not the subject of a peremptory challenge by that party.

(E) Whether a reason might be disproportionately associated with a race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or perceived membership in any of those groups.

(F) Whether the reason given by the party exercising the peremptory challenge was contrary to or unsupported by the record.

(G) Whether the counsel or counsel's office exercising the challenge has used peremptory challenges disproportionately against a given race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or perceived membership in any of those groups, in the present case or in past cases . . . . (§ 231.7, subd. (d)(3).)

Although not at issue here, section 231.7 also contains two distinct sets of presumptively invalid reasons to excuse a juror. (See *id.*, subds. (e) & (g).) The standard by which the trial court analyzes a presumptively invalid peremptory challenge is different than the standard described in section 231.7, subdivision (d)(1) for non-presumptively invalid reasons. (*Ortiz, supra*, 96 Cal.App.5th at p. 793 [noting that "[e]ach subdivision sets out a distinct process by which a court determines whether a presumptively invalid reason can be absolved of that presumption"].) To overcome the presumption of a discriminatory purpose, " 'the party exercising the peremptory challenge [must] show by clear and convincing evidence that an objectively reasonable person would view the rationale as unrelated to a prospective juror's [actual or perceived membership in a cognizable group], and that the reasons articulated bear on the prospective juror's ability to be fair and impartial in the case.' " (*Jimenez, supra*, 99 Cal.App.5th at p. 540,

16

quoting § 231.7, subd. (e).)  Applying this standard, the court must

" 'determine[] that it is highly probable that the reasons given for the exercise of a peremptory challenge are unrelated to conscious or unconscious bias and are instead specific to the juror and bear on that juror's ability to be fair and impartial in the case.' ([§ 231.7,] subd. (f).)" (*Jimenez*, at p. 540.)  "The court [must] explain the reasons for its ruling on the record." (§ 231.7, subd. (d)(1).)

Section 231.7, subdivision (j) describes the standard of review for appellate challenges arising under the statute.  We review "[t]he denial of an objection made under [the statute] . . . de novo, with the trial court's express factual findings reviewed for substantial evidence." (*Ibid*.)  We may "consider only reasons actually given" by the party exercising the peremptory challenge, and we may "not impute to the trial court any findings . . . that the trial court did not expressly state on the record." (*Ibid*.)  If we "determine that the objection was erroneously denied," we must deem the error prejudicial, reverse the judgment, and remand the case for a new trial. (*Ibid*.)

## 2.  Jury Selection During Trial

Jury selection began on September 15, 2022, about eight months after section 231.7 became operative. (§ 231.7, subd. (i).)  Prospective jurors completed a one page, 14-question written questionnaire that probed, among other things, their willingness to follow the court's instructions on the law,[9]

---

[9] Question 11 stated, "I will follow the law as the judge gives it, *even if I disagree with it*."  Prospective jurors had the option of responding with "I agree," "I disagree," or "I do not understand."

their ability to be fair and impartial,[10] and whether they had ever been the victim of a crime.[11] The court and counsel then questioned the prospective jurors, with each counsel limited to 30 minutes of questioning. Two of the prospective jurors at issue here — Prospective Juror Nos. 61 and 74 — were among the first 12 prospective jurors to be questioned.

Much of the prosecutor's questioning focused on the single-witness rule, which the prosecutor introduced as follows:

> Does everyone agree that crime doesn't necessarily happen in the middle of a park on Sunday afternoon, or a room full of people that are witnesses? Would everyone agree with that?
>
> Because of that, the judge will instruct that, quote: The testimony of a single witness can prove any fact. Before concluding that the testimony of one witness proves a fact, you should carefully review all of the evidence.
>
> Some people say that they have no problem reaching a verdict just with the testimony of a single witness, while others say I don't think I can convict without something more.

The prosecutor asked Prospective Juror No. 74 for her thoughts on the subject. She responded, "I think you need to hear multiple stories to get the larger picture. Not one person's testimony can give you the facts to come to a conclusion." The prosecutor followed up with a hypothetical scenario involving a daughter testifying in a trial about seeing a shooting: "What if

[10] Question 13 stated, "I will be fair *and* impartial to both sides." Prospective jurors had the option of responding with "I agree," "I disagree," or "I do not understand."

[11] Question 10 asked, "Have you *and/or* anyone you know ever been a victim of a crime?" The questionnaire followed up: "If yes, how was that person related to you *and* tell us, very briefly, what happened."

[the] daughter is the only witness to that case and the suspect flees, takes the gun. He uses a revolver, so there is no [fired cartridge casing]. There is no other physical evidence outside of what her daughter told law enforcement. Would the victim who got shot in that instance, would you not be able to reach a verdict in that instance?" Prospective Juror No. 74 responded, "Maybe not. Just depended on what the person testified, and if there was any other evidence."

The prosecutor then asked Prospective Juror No. 61 where she "would . . . fall on that spectrum." Prospective Juror No. 61 responded, "I agree with her [Prospective Juror No. 74]. I think you need to look at the facts. And it will be difficult to reach a verdict with one witness without looking at other facts surrounding the situation."

The prosecutor asked if "anyone else ha[d] any thoughts on that issue." Prospective Juror No. 50 replied, "You have to hear the whole story. I mean it can't just be one-sided."[12]

Similarly, when the prosecutor asked Prospective Juror No. 56 if he would "be able to reach a . . . verdict based on a single witness," he responded, "Witness and evidence. Evidence is building blocks. So the more blocks you have, the better you can make a decision from both sides."

On a different subject, the prosecutor asked if "everyone would agree that [they] would be able to reach a guilty verdict if there is no DNA and no fingerprint[]" evidence. Prospective Juror Nos. 61 and 74 both responded, "Yes."

At this point, the trial court informed the prosecutor he had two minutes remaining in his allotted questioning time. After "wrapping up" his

_____

[12] The trial court excused Prospective Juror No. 50 when she failed to appear for the second day of jury selection.

19

questioning of the initial jury panel, the prosecutor added, "I was hoping to get to specific questions based on your questionnaires. I will sit back down and potentially get to that in the future."

Following an unreported sidebar and additional questioning, the trial court excused two of the first 12 prospective jurors for cause and replaced them with two additional prospective jurors.[13] When asked about the prosecutor's single-witness hypothetical, one of these replacement jurors (Prospective Juror No. 86) said: "I think if . . . there was only one witness, you would have to look at all the evidence, look at everything, you know, the whole witness credibility. And you would make your decisions." The other replacement prospective juror (Prospective Juror No. 82) stated she agreed.

At this point, the prosecutor exercised his first peremptory challenge and excused Prospective Juror No. 74. The court replaced her with Prospective Juror No. 76, who stated she would have no "hesitation" reaching a verdict in the prosecutor's single-witness hypothetical. Neither party sought to excuse this prospective juror for cause. The trial court asked if defendant wished to exercise his first peremptory challenge. Defense counsel declined, accepting the jury as composed.

The prosecutor then exercised his second peremptory challenge and excused Prospective Juror No. 82. The court replaced her with Prospective Juror No. 55. The prosecutor asked this replacement about certain of his questionnaire responses. In response to the question about being a crime victim, Prospective Juror No. 55 wrote: "Had my car stolen/my house robbed when I was a kid." The prosecutor explained that one likely trial witness

_____

[13]    The trial court conducted its review of for-cause challenges at sidebar, and would later describe the sidebars on the record.

20

"has stolen a car before" and another likely witness burglarized a house. The prosecutor asked Prospective Juror No. 55 if he could evaluate these witnesses' testimony fairly and impartially, considering his experiences. The juror responded that he could.

At this point, both sides determined no cause justified removing the juror, and the trial court asked defense counsel if he wished to exercise a peremptory challenge. He declined. The prosecutor then exercised his third peremptory challenge and excused Prospective Juror No. 61. The court replaced her with Prospective Juror No. 52, who, under questioning by the prosecutor, said she had "no thoughts" on the prosecutor's single-witness hypothetical. Both parties passed for cause on the jury.

The trial court again asked defense counsel if he wished to use a peremptory challenge to a juror. He declined, and the prosecutor then exercised a fourth peremptory challenge, excusing Prospective Juror No. 79. Defense counsel asked for a sidebar. After the sidebar began, the trial court excused the jury from the courtroom so proceedings could continue in open court with a reporter.

Defense counsel stated, "Your Honor, it appears to me that there has been a . . . systematic exclusion of Hispanic jurors with the People's exercise of its peremptory challenges. I believe there is a prima facie for showing so, based on what I could tell. And I'm no race genius. But it appears that he is kicking only Hispanic people so far."

The trial court assessed that of the four prospective jurors as to whom the prosecutor exercised peremptory challenges, Prospective Juror No. 61 "did not appear to be Hispanic," Prospective Juror No. 74 "*possibly* could have been Hispanic," Prospective Juror No. 79 "appeared to be Hispanic," and Prospective Juror No. 82 "did not appear to be Hispanic." (Italics added.)

21

The prosecutor responded, generally, that "race plays no factor in this case"[14] — the "defendant appears to be of Hispanic descent," the "victim . . . is of Hispanic descent," and "several witnesses are of Hispanic descent."

As to Prospective Juror No. 79, the prosecutor maintained that her "race, perceived or not, . . . played no role in [the] exercise of a peremptory challenge." Instead, the prosecutor explained, "In her questionnaire, . . . she mentioned that she was a victim of identity theft twice. One of the witnesses in this case has suffered an identity theft conviction.[15] And that was a heavy basis for my exercise of a peremptory challenge in this case. In addition, during my questioning of [Prospective Juror No. 79] and the other jurors with respect to single-witness testimony, her response also played into any exercise of a prospective juror. But specifically, the exercise and her being a victim of identity theft twice played heavily in my evaluation." When the court asked the prosecutor to specify this prospective juror's responses regarding the single-witness rule, the prosecutor conceded that he did not have "specific notes on her response to single-witness testimony," but the prosecutor recalled that "she agreed with" Prospective Juror No. 74's "responses to the single-witness testimony hypo."

Turning to Prospective Juror No. 74, the prosecutor said, "I don't recall her ethnicity. It weighed no factor in my evaluation of exercising a peremptory challenge. [¶] . . . [¶] She did affirmatively respond . . . to my

---

14     Section 231.7, subdivision (d)(3)(B) states that the totality of circumstances includes "[w]hether race, ethnicity, . . . [or] national origin . . . or perceived membership in any of those groups, bear on the facts of the case to be tried."

15     Samantha (defendant's girlfriend at the time of the offense) testified she was convicted of (among other things) the unauthorized use of personal identifying information in 2013 and 2021.

questioning . . . regarding the single-witness testimony. I don't recall her specific statements. But I believe the court will recall that she did indicate that she would struggle with that rule . . . and that instruction."

Similarly, as to Prospective Juror No. 61, the prosecutor explained: "Likewise. It was her response to the single witness testimony question in hypo that I brought up. In addition, I don't believe that [she] was of Hispanic descent. It was not obvious to me, based on her appearance that she appeared to be of Hispanic descent. And race, again, play[ed] no factor."

As to Prospective Juror No. 82 the prosecutor stated: "I don't believe she is of Hispanic race. She did not appear to be. She appeared to be White. [She] was also young and had limited life experience which was the basis for the exercise of peremptory challenge. And race played no factor in that evaluation."

The court asked defense counsel which prospective jurors he believed were Hispanic. Counsel responded that, in his view, "all but [Prospective Juror No. 82] are." When asked specifically about his belief as to Prospective Juror No. 61, counsel explained: "She looks Hispanic to me. I don't know what to say. I certainly wasn't going to ask her." Counsel said he had the "same answer as to all of them."

On the merits of the prosecutor's justifications, defense counsel argued that the fact that Prospective Juror No. 79 "had been a prior victim of identity theft . . . defies logic" because logic suggests "that is a good juror for the People" and "not an advantage" for the defense. Regarding the prosecutor's single-witness-rule justification, defense counsel argued the challenged prospective jurors' responses were consistent with the unchallenged prospective jurors' responses:

> The information that each of these jurors gave as to the
> single-witness question by the People was consistent

23

with everybody else that was on the panel. They all said we want to listen to all of the facts in light of the testimony. But yes. Nobody disagreed with his position that one witness could prove their case.

These people that he has identified that have said an answer that he didn't like with respect to that question, they answered the same as everybody else, but he singled them out. My feeling is because either it is conscious or unconscious bias.

The trial court, after taking a recess to review its notes and the prospective juror questionnaire responses, overruled the defense objection. Preliminarily, as to the challenged prospective jurors' perceived race, the court stated: "Of the four jurors excused, there is an agreement by both sides that . . . [Prospective Juror No. 82] . . . appears to be White Anglo-Saxon. That was the court's observation. [¶] [Prospective Juror No. 79] appears by her name to be Hispanic. [¶] With regard to [Prospective Juror No. 61] and [Prospective Juror No. 74], they may or may not be Hispanic. It's not obvious based on just looking at them. And nothing that they said specifically indicated that they are Hispanic. But for purposes of this motion, I am going to assume that they are."

Regarding Prospective Juror No. 79, the trial court stated:

[The prosecutor] has indicated as to [Prospective Juror No. 79] that his reason to excuse her was because she had been the victim of identity theft on two occasions. And he has a prosecution witness who has been convicted of identity theft. And he expects that witness basically to be impeached with that information.

The court is satisfied that there is a *high probability* that this is a valid reasoning and it is *unrelated to conscious or unconscious bias, and bears on this juror's specific ability to be fair and impartial* in judging the credibility of that prosecution witness. (Italics added.)

24

As to Prospective Juror Nos. 74 and 61, the court reasoned:

> Each of those prospective jurors voiced concern over the single-witness rule. [Prospective Juror No. 74] stated that she would need more evidence than a single witness. And [Prospective Juror No. 61] stated she would have a difficult time following the one-witness rule.
>
> [The prosecutor] stated that each of these jurors was excused because they voiced difficulties with the one-witness rule. From my notes, none of the other jurors expressed a specific difficulty with applying the single-witness rule.
>
> The court finds it highly probable that the reason again for the peremptory challenge as to each of these jurors is unrelated to conscious or unconscious bias, but is specific to each of these two jurors and bears on that individual juror's ability to follow the law in this case.

When jury selection resumed, the prosecutor exercised only one more peremptory challenge, bringing the total to five. The court ultimately swore-in 12 trial jurors and three alternate jurors.

### 3. Analysis

At the outset, we note that our statutorily required de novo review in this case is made difficult by the undeveloped appellate record relating to the threshold issue of whether the challenged prospective jurors are members of a cognizable group. The trial court made no express finding on this issue as to any of the four challenged jurors. As to two of the four, the court merely *assumed* for purposes of defendant's objection that they are members of a cognizable group. Under section 231.7, subdivision (j), however, only "the trial court's *express factual findings*" are entitled to review under the deferential "substantial evidence" standard. (Italics added.)

To the extent the trial court did opine on the subject, the court appeared unpersuaded that three of the four challenged jurors are members of a cognizable group.[16] The trial court initially observed that Prospective Juror No. 61 "did not appear to be Hispanic" and Prospective Juror No. 74 "*possibly* could have been Hispanic." (Italics added.) Before ruling, the court again observed that these two prospective jurors "may or may not be Hispanic. It's not obvious based on just looking at them. And nothing that they said specifically indicated that they are Hispanic." When the trial court asked defense counsel to elaborate on his reasons for perceiving the challenged prospective jurors to be Hispanic, counsel offered no specifics (e.g., appearance, answers to questions, etc.) and stated he "certainly wasn't going to ask" the prospective jurors. Nor did the prosecutor or trial court inquire further as to the challenged prospective jurors' potential membership in a cognizable group. Instead, despite the trial court's apparent concern that two out of four challenged prospective jurors may *not* be Hispanic, the court nonetheless "assume[d]," without making an express finding, that they *are* Hispanic. While we appreciate the discomfort in asking a prospective juror about his or her membership in a cognizable class described in section 231.7 — it's hardly the topic of typical conversations — it is ultimately an objecting appellant's duty to develop an adequate record that facilitates meaningful appellate review. (See *People v. $17,522.08 United States Currency* (2006) 142 Cal.App.4th 1076, 1084 (*Currency*) ["Appellant bears the burden to provide a record on appeal which affirmatively shows that there

_____

16    Indeed, after initially claiming that the prosecutor, up to that point, used his four peremptory challenges for "kicking *only* Hispanic people," defense counsel conceded that Prospective Juror No. 82 did not appear to be Hispanic and counsel abandoned the challenge as to this prospective juror.

26

was an error below and any uncertainty in the record must be resolved against appellant."].)  Considering the remedy the Legislature mandated for improper peremptory challenges — reversal for a new trial (§ 231.7, subd. (j)) — the parties and the courts should not be reduced to assuming or guessing anything.

Additionally, the record here is lacking not only as to the four challenged prospective jurors, but also as to the selected panelists or the venire as a whole.  Without more information about the seated jurors or the venire, we do not have context in which to evaluate defense counsel's claim that the prosecutor was "kicking *only* Hispanic people."  (See, e.g., *People v. Ramirez* (2022) 13 Cal.5th 997, 1088–1089 [a party seeking to make a prima facie showing under *Batson/Wheeler* " ' "may show that his opponent has struck most or all of the members of the identified group from the venire, or has used a disproportionate number of his peremptories against the group. He may also demonstrate that the [panelists] in question share only this one characteristic — their membership in the group — and that in all other respects they are as heterogeneous as the community as a whole" ' "].)  If *all* the prospective jurors were Hispanic, this charge would carry less weight.  If the challenged jurors were the *only* Hispanic prospective jurors in the venire, the allegation would carry more weight.  But without *any* information about

27

the composition of the venire or the seated jurors, we are left without important details.[17]

The stakes are high for everyone when a party objects under section 231.7. An erroneous overruling by a trial judge of a valid objection *requires* reversal. (§ 231.7, subd. (j).) Likewise, the sustaining of an objection can have lasting ramifications and implications for the party (or the party's office) exercising the peremptory challenge. (*Id.*, subd. (d)(3)(G) [specifying that one of the circumstances a court may consider when assessing the validity of a peremptory challenge is "[w]hether the counsel or counsel's office exercising the challenge has used peremptory challenges disproportionately against a given [cognizable group] in the present case *or in past cases*" (italics added)].) Therefore, it is imperative to develop an adequate record to assist appellate review.

As to defendant's specific challenges here, we conclude the deficiencies in the record concerning race, ethnicity or nationality preclude meaningful analysis as to Prospective Juror Nos. 61 and 74. The court initially observed that Prospective Juror No. 61 "did not appear to be Hispanic" and Prospective Juror No. 74 "*possibly* could have been Hispanic," while later the trial court stated these two prospective jurors "may or may not be Hispanic. It's not obvious based on just looking at them. And nothing that they said

_____

17    To be sure, sealed portions of the record contain the panel members' full names. And the Supreme Court has "held that Spanish surnames *may* identify Hispanic individuals, who are members of a cognizable class for purposes of *Batson/Wheeler* motions." (*Gutierrez*, *supra*, 2 Cal.5th at p. 1156, fn. 2, italics added.) But relying on surnames on a cold written record has obvious limitations, including that surnames may change upon marriage or may be common to multiple ethnicities that share Spanish colonial heritage. A list of names is therefore not a suitable substitute for a comprehensive record.

specifically indicated that they are Hispanic." Moreover, neither juror's surname appears to be specifically Hispanic. Defendant thus has not provided an appellate record sufficient to make the threshold finding that these prospective jurors are members or perceived members of a cognizable group.

The record is sufficient, however, as to Prospective Juror No. 79 because the trial court and counsel agreed she appeared Hispanic and her surname is Hispanic. (See *Gutierrez*, *supra*, 2 Cal.5th at p. 1156, fn. 2.) But as we now explain, based on our de novo review of the totality of the circumstances pertaining to Prospective Juror No. 79, we conclude on the record before us that "an objectively reasonable person would" *not* "view race . . . or perceived [race] . . . as a factor in the use of the peremptory challenge." (§ 231.7, subd. (d)(1).)

Several circumstances support this conclusion. First, the prosecutor's rationale for excusing Juror No. 79 is neither presumptively invalid (§ 231.7, subd. (e)) nor "historically . . . associated with improper discrimination in jury selection" (*id.*, subd. (g)(1)).[18] The prosecutor explained he challenged this prospective juror primarily because "she mentioned [in her questionnaire] that she was a victim of identity theft twice," and "one of the witnesses in this

---

18 Although the trial court's ruling on defendant's objection here reflected the statutory terminology that applies to presumptively invalid grounds for exercising a peremptory challenge — whether "it is highly probable that the reasons given for the exercise of a peremptory challenge are unrelated to conscious or unconscious bias and are instead specific to the juror and bear on that juror's ability to be fair and impartial in the case" (§ 231.7, subd. (f)) — we find the misstatement immaterial. First, we review the court's ruling de novo. (*Id.*, subd. (j).) And, in any event, the trial court appeared to apply a *higher* standard than was required under the circumstances. Still, we urge trial courts to ensure that their rulings reflect the appropriate statutory terminology.

case has suffered an identity theft conviction."[19] The trial court interpreted this to mean that the prosecutor likely "expect[ed] th[e] witness basically to be impeached with that information," which would "bear[] on this juror's specific ability to be fair and impartial in judging the credibility of that prosecution witness." This is the most logical inference to draw from the prosecutor's proffered justification and is consistent with the prosecutor's questioning of Prospective Juror No. 55 about whether he could fairly and impartially evaluate the prosecution witnesses' testimony in light of his experiences as a crime victim.[20] The prosecutor's stated rationale for excusing Prospective Juror No. 79 was, thus, facially race-neutral.

Second, only two statutory factors for evaluating non-presumptively invalid justifications apply here. (See § 231.7, subd. (d)(3).) It is true that

_____

[19] The prosecutor also initially stated that Prospective Juror No. 79's responses regarding the single-witness rule played a role in the prosecutor's decisions, but the prosecutor appeared to withdraw this justification when his notes did not support it. Our review of the record shows no questioning was directed to Prospective Juror No. 79 regarding the single-witness rule. Although we find no reversible error here, counsel must be careful when justifying their exercise of peremptory challenges because asserting an unsubstantiated justification can undermine both that justification *and others*. (See § 231.7, subd. (d)(3)(F) [the totality of circumstances includes "[w]hether the reason given by the party exercising the peremptory challenge was contrary to or unsupported by the record"]; cf. *People v. Smith* (2018) 4 Cal.5th 1134, 1157–1158 ["A prosecutor's positing of multiple reasons, some of which, upon examination, prove implausible or unsupported by the facts, can in some circumstances fatally impair the prosecutor's credibility" for purposes of the third *Batson/Wheeler* step].)

[20] Because the prosecutor articulated this rationale in his questioning of a prospective juror, we are unpersuaded by defendant's argument that the trial court's reference to fairness and impartiality constituted improper "speculat[ion] on . . . other possible justifications for the use of the peremptory challenge." (§ 231.7, subd. (d)(1).)

defendant and Prospective Juror No. 79 both appear to be Hispanic. (*Id.*, subd. (d)(3)(A)(i) ["The objecting party is a member of the same perceived cognizable group as the challenged juror."].) But that circumstance is counterbalanced by the fact that the victim and many of the witnesses are also Hispanic. (See *id.*, subd. (d)(3)(A)(ii) ["The alleged victim is not a member of that perceived cognizable group."]; *id.*, subd. (d)(3)(A)(iii) ["Witnesses or the parties are not members of that perceived cognizable group."].) Additionally, "race . . . or perceived [race]" did not "bear on the facts of the case to be tried." (*Id.*, subd. (d)(3)(B).) That is, the issues in the case did not evoke racial undertones.

The only other statutory factor that appears to apply is the prosecutor's failure to question Prospective Juror No. 79 about her questionnaire response indicating she had been the victim of identity theft. (See § 231.7, subd. (d)(3)(C)(i) ["[w]hether the party exercising the peremptory challenge failed to question the prospective juror about the concerns later stated by the party as the reason for the peremptory challenge"].) But the record explains this failure. The prosecutor examined Prospective Juror No. 79 during his questioning of the first 12 jurors, when he was limited to 30 minutes. When his time ran out, the prosecutor explained he had "hop[ed] to get to specific questions based on [the prospective jurors'] questionnaires." The trial court, however, limited the attorneys' future questioning only to "new people" who replaced dismissed prospective jurors. We therefore place little weight on the fact the prosecutor did not ask Prospective Juror No. 79 about her questionnaire response indicating she had been the victim of identity theft. (See *People v. Miles* (2020) 9 Cal.5th 513, 544 ["The prosecutor's failure to question [the challenged prospective juror] about 'each and every area of articulated concern' . . . does not necessarily demonstrate that those concerns

31

were pretextual," particularly where "the prosecutor received before voir dire, [the prospective juror]'s responses to [a] 31-page written questionnaire"].)

Defendant fails to persuade us that other statutory factors apply. For example, he contends the prosecutor "used peremptory challenges disproportionately against [Hispanic prospective jurors] . . . in the present case." (§ 231.7, subd. (d)(3)(G).) As we explained above, however, defendant has not presented an appellate record sufficient to support this claim.

Defendant also relies on the fact that, while the prosecutor failed to question Prospective Juror No. 79 about her questionnaire response, the prosecutor *did* question Prospective Juror No. 55 about his response relating his past experience as a crime victim. Defendant maintains this disparate questioning implicates section 231.7, subdivision (d)(3)(D), which sets forth as a factor "[w]hether other prospective jurors, who are not members of the same cognizable group as the challenged prospective juror, provided similar . . . answers but were not the subject of a peremptory challenge by that party." We disagree. To begin, defendant has not shown that Prospective Juror No. 79 and Prospective Juror No. 55 "are not members of the same cognizable group." (*Ibid.*) To the contrary, sealed portions of the record indicate Prospective Juror No. 55 has a Hispanic surname, thus suggesting he and Prospective Juror No. 79 *are* members of the same cognizable group. Accordingly, this statutory factor does not apply.

Even if it did apply, defendant did not raise this argument in the trial court, which denied the prosecutor the opportunity to provide a race-neutral

explanation. We see several.[21] First, as noted, the prosecutor examined Prospective Juror No. 79 as part of the original group of 12 prospective jurors, when his time was limited and he explained he ran out of time to ask about questionnaire responses. By contrast, the prosecutor questioned Prospective Juror No. 55 after this prospective juror replaced another excused juror. In this context, the prosecutor truncated his general questioning of Prospective Juror No. 55 by referencing the earlier questioning of other jurors — asking, for example, "You heard the questions I was asking. [¶] . . . [¶] Anything jump out to you?" — which left time to explore Prospective Juror No. 55's questionnaire responses. The prosecutor questioned other replacement prospective jurors in a similar manner.

Second, there are valid, race-neutral reasons for questioning Prospective Juror No. 79 and Prospective Juror No. 55 differently about their experiences as crime victims. Prospective Juror No. 79 reported that she had been the victim of identity theft. One of the prosecutor's key witnesses, Samantha — whose testimony included the key detail that defendant heard Flores was " 'no good' " and that defendant said he was " 'going to get this fool' " — had identity theft convictions. By contrast, Prospective Juror No. 55 revealed he had been the victim of a vehicle theft and a home burglary. The prosecution witnesses who had convictions for these offenses were less crucial to the prosecution case (e.g., Dominic, who had been convicted of burglary,

---

21 To be clear, we are "not speculat[ing] as to or consider[ing] reasons that were not given to explain either the [prosecutor]'s use of the peremptory challenge or the [prosecutor]'s failure to challenge similarly situated jurors who are not members of the same cognizable group as the challenged juror," as prohibited by section 231.7, subdivision (j). Rather, we are merely illustrating why defendant's failure to assert this ground in the trial court resulted in a deficient appellate record on this point.

testified only about the circumstances of defendant's reckless evasion; and Sky, who was in the BMW but did not see Flores get shot, suffered two auto theft convictions). In light of these considerations, the prosecutor may not have wanted Prospective Juror No. 79's explanation of potentially harrowing experiences with identity theft to undermine a key witness in front of the entire venire.

On balance, our de novo review of the record leads us to conclude there is *not* "a substantial likelihood that an objectively reasonable person would view race . . . or perceived [race] . . . as a factor in the use of the [prosecutor's] peremptory challenge[s]" here.[22] (§ 231.7, subd. (d)(1).)

---

[22] Defendant contends that the same arguments on which he bases his claim of a violation of section 231.7 also establish a violation of his state and federal constitutional rights. (See *id.*, subd. (d)(1) ["A motion brought under this section shall also be deemed a sufficient presentation of claims asserting the discriminatory exclusion of jurors in violation of the United States and California Constitutions."].) Defendant offers no argument and cites no authority unique to a constitutional violation analysis. Accordingly, he has not met his burden as appellant to demonstrate error under this standard. (See *People v. Gonzalez* (2021) 12 Cal.5th 367, 409 [arguments "state[d] in conclusory fashion" do not meet the appellant's burden to show error].) Although we conclude defendant failed to establish a constitutional violation here, "[w]e decline to express an opinion regarding whether *in every case*, a determination of unconstitutional use of a peremptory challenge is precluded by a determination that no section 231.7 violation exists." (*Jimenez, supra,* 99 Cal.App.5th at p. 547, fn. 4, italics added; but see *Ortiz, supra,* 96 Cal.App.5th at p. 808 ["Because section 231.7 provides broader protection than that afforded under *Batson/Wheeler* [citations], [the defendant]'s failure to demonstrate error under section 231.7 necessarily leads us to conclude that there was no violation of his constitutional rights when the prosecutor exercised a peremptory challenge"].)

**B. Any Error in Failing to Instruct on Excusable Homicide Was Harmless**

Defendant contends the trial court erred by failing to instruct the jury regarding excusable homicide based on accident or misfortune principles. (See Pen. Code, § 195 ["Homicide is excusable [¶] . . . [¶] [w]hen committed by accident or misfortune."; *id.*, § 26 ["[a]ll persons are capable of committing crimes except those [¶] . . . [¶] who committed the act . . . through misfortune or by accident"].) He contends his testimony constituted substantial evidence that his shooting of Flores was accidental and, thus, required the trial court to instruct the jury regarding accident principles. (See *People v. Gonzalez* (2018) 5 Cal.5th 186, 199, fn. 3 [a claim of "accident" in response to a murder charge is "a request for [a pinpoint] instruction that negates the intent element of malice murder" and must be given when " ' "there is evidence supportive of the theory" ' "].) Defendant asserts the error is subject to review under the heightened *Chapman*[23] "beyond a reasonable doubt" standard that applies to errors of federal constitutional dimension.

The People concede defendant's testimony constituted substantial evidence warranting a pinpoint instruction on accidental homicide. But they contend the error is subject to review under the lower *Watson*[24] "reasonably probable" standard that applies to errors under state law. (See *People v. Sandoval* (2015) 62 Cal.4th 394, 421–422.)

We accept the People's concession that the trial court erred by failing to instruct the jury regarding accident and misfortune principles. (See *People v. Villanueva* (2008) 169 Cal.App.4th 41, 54 ["When a murder defendant relies

[23]   *Chapman v. California* (1967) 386 U.S. 18.

[24]   *People v. Watson* (1956) 46 Cal.2d 818.

on the theory that the homicide was committed by accident while the defendant was lawfully acting in self-defense without any unlawful intent, the jury should be instructed on excusable homicide."].)  We need not resolve whether the *Chapman* or *Watson* standard applies because we conclude the error was harmless even under the heightened *Chapman* standard.

Instructional error is harmless under the *Chapman* standard when " ' "the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions." ' " (*People v. Scully* (2021) 11 Cal.5th 542, 595 (*Scully*); see *In re Lopez* (2023) 14 Cal.5th 562, 584–585 [" 'The reviewing court examines what the jury necessarily did find and asks whether it would be impossible, on the evidence, for the jury to find that without also finding the missing fact as well.' " (Italics omitted.)].)  Here, several of the jury's findings indicate the jury necessarily resolved defendant's accidental homicide claim adversely to him.

First, and most directly, the jury found true the firearm enhancement allegation "that in the commission of the [murder], the defendant . . . personally and *intentionally discharged a firearm*, a handgun, which proximately caused great bodily injury and death."  Second, in finding the lying-in-wait special-circumstance allegation to be true, the jury necessarily found that "defendant *intentionally killed*" Flores and "*intended to kill* [him] by taking [him] by surprise."  (CALCRIM No. 728, italics added.)  These findings of an *intentional* shooting and an *intentional* killing directly refute defendant's claim that he accidentally fired his gun.  (See *Scully*, *supra*, 11 Cal.5th at p. 595 [holding that the jury's "explicit findings" on enhancement allegations that the defendant "intentionally killed" a sheriff's

deputy and did so "for the purpose of avoiding arrest" "necessarily rejected [the] defendant's argument that he accidentally shot the deputy"].)

Defendant argues the Supreme Court in *People v. Schuller* (2023) 15 Cal.5th 237 "rejected" a similar approach to the one we take here. Not so. The error in *Schuller* arose from the Court of Appeal's inconsistent findings — based on an improper reweighing of evidence — "both that [the defendant] presented sufficient evidence to support an instruction on imperfect self-defense *and* that the error was harmless based solely on the conclusion that the evidence was so overwhelming as to compel a finding against him on that theory." (*Id*. at p. 263.) By contrast, we have not "performed [our] own weighing of the evidence" (*id*. at p. 262) — or even considered the state of the evidence. Rather, our finding of harmlessness under *Chapman* is based only on the jury's express findings, an approach the *Schuller* court condoned. (See *Schuller*, at p. 244, citing *In re Lopez*, *supra*, 14 Cal.5th at p. 591.)

## C. The Trial Court Did Not Err by Allowing an Expert Witness to Answer a Hypothetical Question That Refuted Defendant's Testimony

Defendant raises two challenges arising from the trial court's alleged error in allowing a sheriff's sergeant to answer a hypothetical question that refuted defendant's version of the shooting. First, defendant contends the hypothetical question "lacked foundation because it was based on the prosecutor's interpretation as to how he believed [defendant] was holding the gun, and not on any actual evidence." Second, assuming there was no foundation, defendant argues the unfounded opinion testimony constituted improper opinion testimony regarding defendant's credibility. These challenges lack merit.

37

### 1. Background

As noted, defendant testified in his own defense. On direct examination, he testified that his firearm accidentally discharged as he pulled it from his waistband. On cross-examination, the prosecutor explored in greater detail the firearm's position when it went off:

> [Prosecutor]: Okay. Can you describe for us again how you were holding the gun at the time you shoot [Flores]? [¶] . . . [¶]
>
> [Defendant]: I know I pulled my hips up, and I pulled it out. [¶] . . . [¶]
>
> [Prosecutor]: Okay. So, you have the gun ready to use at the time the shot goes off. Where is the gun in relation to your body?
>
> [Defendant]: It is away from my body.
>
> [Prosecutor]: Okay. But where exactly how are you holding it at the time the shot goes off?
>
> [Defendant]: When I held it, I held it off. [¶] . . . [¶]
>
> The Court: In answering the last question, the witness raised up slightly off of his right hip, and again made the motion of moving his hands from the side of his body to the front of his body. And he had his finger, index finger pointed forward at that point. [¶] . . . [¶]
>
> [Prosecutor]: So how is it, at the time the shot goes off, where is the gun at? How are you holding it? [¶] . . . [¶]
>
> [Defendant]: At the time the gun went off, at that point, I don't know. I just know the gun went off.
>
> [Prosecutor]: So, you don't know how you're holding it?
>
> [Defendant]: It was in my hand.
>
> [Prosecutor]: You just know you're holding it, and you're pointing it at [Flores]?

[Defendant]: I picked it up like that, and the gun went off.

[Prosecutor]: So, is the gun pointed down when it goes off?

[Defendant]: I can't call [*sic*] that. I just know I picked it up.

[Prosecutor]: So, at the time the shot goes off, can you just hold up your hand as you had the gun in your hand at that exact moment?

[Defendant]: I – so when I got it, I pull it out of my waist. It could have went off from here to there. It happened quick.

[Prosecutor]: Well, could you hold your hand in the exact spot that you had it when the gun went off?

[Defendant]: I leaned back. I know I lifted my hips up. And I pulled it out.

[Prosecutor]: Could you hold your hand as you exactly held it at that time?

[Defendant]: I am not saying that I held it. I just know I pulled it out of my waist, and it went off.

[Prosecutor]: Okay. So, it is possible you could have pointed it directly at the back of his head?

[Defense counsel]: Objection; assumes a fact not in evidence, that he is pointing it.

The Court: Overruled.

[Defendant]: I point it in front of me. I know that.

The defense also recalled the forensic pathologist who performed the autopsy on Flores. The pathologist described his use of trajectory rods to trace the path the bullet traveled through Flores's head. The pathologist

explained that if the gun was fired from below the entry wound, then the trajectory would be upward.  He could not, however, determine the exact degree or angle of the trajectory.

The defense also recalled San Bernardino County Sheriff's Sergeant Josh Guerry, who testified in the prosecution case-in-chief regarding his role processing the crime scene.  Sergeant Guerry testified he never recovered an expended bullet or found impact strikes on structures in the area, which would have assisted in determining the bullet's trajectory.

When questioned by the prosecutor, Sergeant Guerry testified that, based on his training and experience, the stippling around the entry wound on Flores's head indicated the gun was fired from "approximately . . . one to two feet" away.  The sergeant then answered a hypothetical question about the circumstances of the shooting:

> [Prosecutor]:  So, let me ask you a hypothetical.  If someone is seated in the back seat of that BMW and just lifted up the gun like this and shoots it, would the stippling be that pronounced?
>
> [Defense counsel]:  Objection; speculation.  Lacks foundation.
>
> The Court:  Overruled.
>
> [Sgt. Guerry]:  No.

### 2.  Relevant Legal Principles

" 'While lay witnesses are allowed to testify only about matters within their personal knowledge (Evid. Code, § 702, subd. (a)), expert witnesses are given greater latitude.  "A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a).)  An expert may express an opinion on "a subject

40

that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).)' [Citation.] 'The trial court has broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion.' " (*People v. Duong* (2020) 10 Cal.5th 36, 60; see *People v. Tafoya* (2007) 42 Cal.4th 147, 165 ["We review a trial court's ruling on the sufficiency of the foundational evidence under an abuse of discretion standard."].)

" 'Generally, an expert may render opinion testimony on the basis of facts given "in a hypothetical question that asks the expert to assume their truth." ' " (*People v. Vang* (2011) 52 Cal.4th 1038, 1045.) But the "[u]se of hypothetical questions is subject to an important requirement. 'Such a hypothetical question must be rooted in facts shown by the evidence.' " (*Ibid*.) Yet, "[a] hypothetical question need not encompass all of the evidence." (*Id*. at p. 1046.) " 'The statement may assume facts within the limits of the evidence, not unfairly assembled, upon which the opinion of the expert is required, and considerable latitude must be allowed in the choice of facts as to the basis upon which to frame a hypothetical question.' " (*Ibid*.) " 'On the other hand, the expert's opinion may not be based "on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors." ' " (*Ibid*.)

### 3. Analysis

We conclude the trial court acted within its discretion in admitting Sergeant Guerry's answer to the prosecutor's hypothetical question.

As a threshold matter, the record is insufficient to support defendant's claim of error. (See *Currency*, *supra*, 142 Cal.App.4th at p. 1084.) Specifically, while the challenged hypothetical question relates to stippling

41

"[i]f someone . . . lifted up [a] gun *like this* and shoots it," the record does not describe what "like this" means. At times, the trial court described for the record the physical gestures defendant made while testifying. But the record contains no description of the prosecutor's physical gesture while asking this hypothetical question. Defendant asserts the hypothetical question "clearly pertained to [defendant]'s version of the events where [he] testified the gun went off as he removed it from his waistband." This is speculation. Without certainty in the record about what "like this" means, we are unable to meaningfully evaluate defendant's claim.

In any event, even assuming defendant's speculation about the prosecutor's gesture is correct, we conclude the trial court acted within its discretion in determining there was sufficient foundational evidence to allow an expert to conclude the stippling was inconsistent with defendant's testimony about his shooting position. Defendant and other witnesses testified to the BMW occupants' seat locations. The forensic pathologist and Sergeant Guerry testified about trajectories and stippling. Indeed, Sergeant Guerry elaborated on how stippling varies based on the distance between the firearm and the target. And defendant testified about a range of possible positions he was in when his firearm discharged — from "pull[ing] it out of [his] waist," to "away from [his] body" to "point[ing] it in front of [him]." It was within the trial court's discretion to conclude Sergeant Guerry reasonably could opine that the stippling around Flores's gunshot wound was inconsistent with certain shooting positions. Thus, although Sergeant Guerry's testimony may not have established precisely where the firearm was when it discharged, it was helpful to the jury in establishing where the firearm was *not*.

Defendant's testimony about the range of possible locations of the firearm when it discharged — though uncertain — distinguishes the foundational evidence here from the lack of foundational evidence in *People v. Moore* (2011) 51 Cal.4th 386, on which defendant relies. In *Moore*, an expert's opinion about a particular bloodstain rested on a completely unfounded assumption that the bloodstain was deposited directly from a person rather than an object. (*Id.* at p. 405.) But "on cross-examination by the defense, as in [a] hearing on admissibility, [the expert] testified he could not determine whether the stain had been deposited from a person or from an object." (*Ibid.*) Here, by contrast, Sergeant Guerry made no similar concessions that undercut the very foundation for his opinion.

Because we conclude there was an adequate evidentiary foundation for the hypothetical question, we likewise reject defendant's contingent argument that "*without* any foundational basis," the question "amounted to an improper opinion on [defendant]'s credibility." Defendant's reliance on *People v. Rouston* (2024) 99 Cal.App.5th 997 to support a contrary conclusion is unavailing. In *Rouston*, our court held that an expert's opinion about who fired a gun constituted improper opinion testimony because it was based primarily on an inference the expert drew from the testimony of another witness whom the jury was equally equipped to evaluate. (*Id.* at p. 1011; see *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 82 [expert opinion regarding credibility is generally inadmissible because "the jury generally is as well equipped as the expert to discern whether a witness is being truthful"].) Here, by contrast, Sergeant Guerry offered an opinion based on his expertise regarding stippling, which defendant does not contend was within the common experience of jurors.

**D. Defendant Forfeited His Prosecutorial Misconduct Claim**

Defendant contends the prosecutor engaged in misconduct during closing argument by (1) "attempting to eliminate the presumption of innocence and lowering the burden of proof by telling the jury [defendant] sought to mitigate his guilt by testifying," and (2) "by telling the jury [defendant] could have called Dude as a witness where the record showed the prosecutor knew Dude was unavailable." The People maintain defendant forfeited these claims by failing to object on the first ground and by failing to request a curative admonition as to either ground. We agree. Anticipating this result, defendant argues in the alternative that any failure to preserve these issues for appeal was the result of ineffective assistance of counsel. We disagree.

**1. Background**

During the prosecutor's rebuttal closing argument, he commented on the jury instruction that pertains to evaluating witness credibility (CALCRIM No. 226). Regarding the factor that asks whether the "witness's testimony [was] influenced by a factor such as a personal interest in how the case is decided," the prosecutor argued: "Of course, when the defendant testifies, he's going to do everything he can to mitigate his guilt, which is exactly what he did. And it's contrary to every piece of physical evidence as well as the testimony of the witnesses in this case." Defendant did not object to this argument or request an admonition.

Later in the prosecutor's rebuttal, he commented on defendant's failure to call Dude as a witness to corroborate defendant's testimony about a large SUV at the crime scene:

> And while we talk about witnesses, the defendant kept talking about this large SUV that was driving by at the

44

time of the shooting that no one sees at the time of the shooting . . . . [A testifying neighbor] had a direct line of sight for when the gun is fired. She doesn't describe the large SUV.

And [Sky], when you evaluate her statements and in light of all the other evidence, the SUV that she was talking about had to have been the CRV.

Despite that, there is someone who was not cooperative with law enforcement who would have been in the best position to not only see what happens inside the car, but also whether there was an SUV at the time. And that is [Dude].

So, again, so no one is required to call witnesses. But if there was someone who could corroborate this, it will be the defendant's friend. And we didn't hear from [Dude].

Defense counsel objected: "That is improper argument. Counsel knows better. The guy is in jail, got a lawyer. What are we doing?" The court convened an unreported sidebar conference. Later, outside the jury's presence, the court recapped what occurred during the sidebar:

I indicated when counsel approached that both counsel made improper arguments during this trial. And I ordered [defense counsel] to stop making comments in front of the jury because he had made a significant comment.

And [prosecutor], I found that your argument with regard to [Dude], based on your theory of the case and your discussion of the case, [Dude] appears to be a direct participant, coconspirator in this case. You would have known that he had a right not to testify. So whether or not the defendant called him or not, I am sure that you would not have granted him immunity.

The prosecutor responded that case law allowed him to comment on a defendant's failure to call a coconspirator as a witness "until that person is

45

called and invokes his Fifth Amendment privilege." The court responded, "All right. All right." Defense counsel did not request an admonition at this point or clarify for the record that he had done so during the unreported sidebar conference.

## 2. Relevant Legal Principles

"The use of deceptive or reprehensible methods to persuade the jury constitutes [prosecutorial] misconduct." (*People v. Sanchez* (2016) 63 Cal.4th 411, 475; *People v. Centeno* (2014) 60 Cal.4th 659, 666–667 [" '[T]he term prosecutorial "misconduct" is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error.' "].) " ' "A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.] In other words, the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' [Citation.] A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 894.)

"A claim of prosecutorial misconduct is not preserved unless the defendant makes a *timely* objection *and* requests an admonition." (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1241 (*Hajek and Vo*); see *People v. Seumanu* (2015) 61 Cal.4th 1293, 1340 [noting this rule "is well established"].) " 'The reason for this rule, of course, is that "the trial court should be given an opportunity to correct the abuse and thus, if possible, prevent by suitable instructions the harmful effect upon the minds of the

46

jury." ' " (*Seumanu*, at p. 1341.)  It also " 'ensures that the opposing party is given an opportunity to address the objection, and it prevents a party from engaging in gamesmanship by choosing not to object, awaiting the outcome, and then claiming error.' " (*People v. Williams* (2008) 43 Cal.4th 584, 624.)

"There are two exceptions to this [rule of] forfeiture:  (1) the objection and/or the request for an admonition would have been futile, or (2) the admonition would have been insufficient to cure the harm occasioned by the misconduct.  Forfeiture for failure to request an admonition will also not apply where the trial court immediately overruled the objection to the alleged misconduct, leaving defendant without an opportunity to request an admonition.  A defendant claiming that one of these exceptions applies must find support for his or her claim in the record." (*People v. Panah* (2005) 35 Cal.4th 395, 462.)

### 3.  Defendant Forfeited His Prosecutorial Misconduct Claim

We conclude defendant forfeited both bases of his prosecutorial misconduct claim.

As to the prosecutor's argument that defendant sought to mitigate his guilt by testifying in his own defense, defendant acknowledges that "[d]efense counsel did not object or request an admonition."  This concession is fatal to defendant's challenge.  (See *Hajek and Vo, supra,* 58 Cal.4th at p. 1241.)

Defendant argues it would have been futile for him to object because the trial court later recounted that both counsel had made improper arguments and that the court ordered defense counsel "to stop making comments in front of the jury."  We are not persuaded.  To begin, the trial court had not yet made these comments when the prosecutor made the first challenged argument.  Additionally, the trial court's later comments do not

show it would have been futile to object or request an admonition. Rather, the court merely ordered defense counsel "to stop *making comments* in front of the jury." (Italics added.) This was clearly a reference to defense counsel's improper speaking objection that, "Counsel knows better. The guy is in jail, got a lawyer. What are we doing?" The trial court's admonition to refrain from making extraneous comments in front of the jury is not the type of "unusual circumstance[]"that supports a futility finding. (See *People v. Hill* (1998) 17 Cal.4th 800, 821 [finding that the prosecutor's "continual misconduct, coupled with the trial court's failure to rein in her excesses, created a trial atmosphere so poisonous" that continual objections "would have been futile and counterproductive"]; *People v. Riel* (2000) 22 Cal.4th 1153, 1212–1213 (*Riel*) [rejecting a futility claim and describing *Hill* — on which defendant relies — as "an extreme case"].)

Turning to the prosecutor's reference to defendant not calling Dude as a witness, although defendant timely objected, he failed to request a curative admonition. This forfeited the issue for appeal. (See *Hajek and Vo*, *supra*, 58 Cal.4th at p. 1242 [even where defense counsel timely objected, "By failing to request an admonition, . . . counsel failed to preserve th[e] issue for appellate review"].)

Again, defendant argues it would have been futile to request an admonition because, "while essentially affirming Dude was unavailable," the trial court "did not sustain defense counsel's objection or admonish the jury." The record, however, does not show that the defense ever requested a formal ruling or admonition. It was the defense's burden to do so. (See *Hajek and Vo*, *supra*, 58 Cal.4th at p. 1242; *People v. Ramirez* (2006) 39 Cal.4th 398, 472 ["In order to preserve an issue for review, a defendant must not only request

48

the court to act, but must press for a ruling. The failure to do so forfeits the claim."].)

Alternatively, defendant asserts we can review this forfeited issue because it "involve[s] questions of constitutional law based on the undisputed facts set forth in the record." We disagree. The trial court did not make express findings regarding Dude's unavailability; rather, the court couched its observations as it "appear[ing]" that Dude is a coconspirator and the court's assertion that the prosecutor would not have granted Dude immunity is speculative. In light of these uncertainties, we decline to exercise our discretion to consider a forfeited issue.

### 4. Defendant Has Not Shown He Received Ineffective Assistance of Counsel

Defendant contends that if we conclude he failed to preserve his prosecutorial misconduct claim for appellate review, it was the result of ineffective assistance from his trial counsel. We disagree.

"A defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel. The appellate record, however, rarely shows that the failure to object was the result of counsel's incompetence; generally, such claims are more appropriately litigated on habeas corpus, which allows for an evidentiary hearing where the reasons for defense counsel's actions or omissions can be explored." (*People v. Lopez* (2008) 42 Cal.4th 960, 966 (*Lopez*).)

" 'In order to establish a claim of ineffective assistance of counsel, defendant bears the burden of demonstrating, first, that counsel's performance was deficient because it "fell below an objective standard of reasonableness [¶] . . . under prevailing professional norms." [Citations.]

49

Unless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." [Citation.] If the record "sheds no light on why counsel acted or failed to act in the manner challenged," an appellate claim of ineffective assistance of counsel must be rejected "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." [Citations.] If a defendant meets the burden of establishing that counsel's performance was deficient, he or she also must show that counsel's deficiencies resulted in prejudice, that is, a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ' " (*Lopez*, *supra*, 42 Cal.4th at p. 966; see *Strickland v. Washington* (1984) 466 U.S. 668, 690, 694.)

Defendant's ineffective assistance claim here fails because "the record does not disclose defense counsel['s] reasons for remaining silent." (*People v. Henderson* (2020) 46 Cal.App.5th 533, 549 (*Henderson*).) " '[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance.' " (*People v. Harris* (2008) 43 Cal.4th 1269, 1290 (*Harris*).) "Although trial counsel may have the duty to protect the record when their client's trial interests are truly at stake, they have no duty to object simply to generate appellate issues. Sometimes, the best action an attorney can take regarding an available objection is not to make it." (*Riel*, *supra*, 22 Cal.4th at p. 1202.) " 'Generally, failure to object is a matter of trial tactics as to which we will not exercise judicial hindsight.' " (*Id*. at p. 1185.)

Defense counsel here may have had several "plausible tactical reason[s]" to not object or request an admonition. (*Henderson*, *supra*,

50

46 Cal.App.5th at p. 549.)  For example, counsel "could have decided to refrain from objecting [and requesting an admonition] to avoid drawing the jury's attention to arguments detrimental to the defense case." (*Ibid*.; see *Harris*, *supra*, 43 Cal.4th at p. 1290 ["while requesting an admonition was one tactical option, counsel could also have decided that objecting would focus the jury's attention . . . in ways that would not be helpful to the defense"].) Or counsel could have reasonably concluded that the prosecutor's comments about defendant testifying to mitigate his guilt was a fair inference to draw from the jury instructions.  Alternatively, considering the trial court's admonition to defense counsel to refrain from further improper comments, counsel may have wished to avoid "offending or annoying the jury." (*People v. Welch* (1999) 20 Cal.4th 701, 754.)  Finally, regarding the prosecutor's reference to Dude not testifying, defense counsel may have preferred that his speaking objection be the last thing the jury hear on the topic rather than a nuanced admonition from the court.

"Under these circumstances, we cannot say that ' " 'there simply could be no satisfactory explanation . . .' " ' for counsel's failure to object" or request an admonition.  (*People v. Leonard* (2014) 228 Cal.App.4th 465, 484.)

## IV.  DISPOSITION

The judgment is affirmed.

RUBIN, J.

WE CONCUR:

McCONNELL, P. J.

BUCHANAN, J.